IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LAWRENCE E. WILSON,

                Plaintiff,

     vs.                               Civil Action 2:08-CV-552

                                  Magistrate Judge King

LEON HILL,

                Defendant.

OPINION AND ORDER

Plaintiff, a state inmate, brings this action under 42 U.S.C. § 1983, alleging that defendant corrections officer used excessive force against plaintiff in violation of plaintiff's rights under the Eighth Amendment to the United States Constitution. Plaintiff seeks monetary damages against defendant in both his individual and official capacities. With the consent of the parties, *see* 28 U.S.C. §636(c), this matter is now before the Court on *Defendant Leon Hill's Second Motion for Summary Judgment*, Doc. No. 110 ("*Motion for Summary Judgment*"), on the *Motion of Plaintiff Lawrence E. Wilson to Strike the Affidavit of Dr. Clayborn Taylor and to Exclude His Medical Opinions*, Doc. No. 126 ("*Motion to Strike Taylor Affidavit*") and on the *Motion of Plaintiff Lawrence E. Wilson to Strike the Affidavit of Dr. Daniel Clinchot and to Exclude His Medical Opinions*, Doc. No. 127 ("*Motion to Strike Clinchot Affidavit*").

I.    BACKGROUND

Since December 2005 and at all times relevant to this action, plaintiff has been incarcerated at the Pickaway Correctional

Institution ("PCI"). *Affidavit of Plaintiff Lawrence E. Wilson*, Doc. No. 39, ¶ 1 ("*Plaintiff Affidavit*"); *Deposition of Lawrence E. Wilson*, Doc. No. 34, p. 16 ("*Plaintiff Depo.*"). On January 3, 2008, at approximately 3:55 p.m., plaintiff was standing in the vicinity of his bunk and the rear wall of the dormitory, sipping coffee and waiting for the 4:00 p.m. "standing count."[1] *Plaintiff Affidavit*, ¶ 2; *Plaintiff Depo.*, pp. 21-22. At the same time, defendant and Captain Stewart entered the dormitory. *Id.*; *Deposition of Leon Hill*, Doc. No. 111-1, pp. 25-26 ("*Hill Depo.*"). After defendant approached plaintiff, a dispute arose regarding where plaintiff was standing. *Plaintiff Affidavit*, ¶ 2; *Plaintiff Depo.*, p. 22; *Hill Depo.*, pp. 25-26. Plaintiff climbed onto his bunk, still talking to defendant. *Id*. Defendant ultimately handcuffed plaintiff and escorted him out of the dormitory to an officer's desk. *Plaintiff Affidavit*, ¶ 2; *Plaintiff Depo.*, pp. 22-28; *Hill Depo.*, pp. 26-27.

On June 10, 2008, plaintiff filed this action, alleging that defendant, while handcuffing and escorting plaintiff out of the dormitory on January 3, 2008, "used excessive physical force, without need or provocation, and not applied in a good faith effort to maintain or restore discipline" ("the incident"). *Complaint*, Doc. No. 3, p. 3.[2] Plaintiff further alleges that, as a result, two of his teeth required extraction and he has been diagnosed with bilateral carpal tunnel syndrome and "concussive or head trauma injury is

---

[1]During a standing count at PCI, inmates stand in the immediate proximity of their bunks while corrections officers count the inmates. *Plaintiff Depo.*, pp. 21-22.

[2]The *Complaint* is verified. *Complaint*, p. 4 (declaring under penalty of perjury that the foregoing is true and correct).

suspected." *Id.* at 4.

On May 4, 2009, defendant moved for summary judgment.  Doc. No. 35.  In denying defendant's motion for summary judgment, the Court concluded that the record as to whether or not plaintiff suffered actual physical injury was controverted, precluding the grant of summary judgment.  *Opinion and Order*, Doc. No. 45, pp. 9-11.

Thereafter, the Court appointed counsel for plaintiff and established case deadlines.  *Order*, Doc. No. 52; *Preliminary Pretrial Order*, Doc. No. 58.  On July 1, 2011, defendant again moved for summary judgment.[3]  Plaintiff opposes the *Motion for Summary Judgment*. *Memorandum of Plaintiff Lawrence E. Wilson in Opposition to Defendant's Second Motion for Summary Judgment*, Doc. No. 115 ("*Memo. in Opp.*").

After the filing of *Defendant Leon Hill's Reply in Support of Second Motion for Summary Judgment*, Doc. No. 121 ("*Reply*"), plaintiff moved to strike the declarations of Karen Stanforth and Kooljo Ntim submitted in support of the *Motion for Summary Judgment* because defendant had failed to disclose these witnesses prior to the close of discovery.  Doc. No. 124.  After conferring with counsel, the Court reopened discovery for the limited purpose of deposing Ms. Stanforth and Nurse Ntim.  *Order*, Doc. No. 125.  The Court also permitted supplemental briefing following this discovery, *Order*, Doc. No. 132, and plaintiff filed the *Supplemental Memorandum of Plaintiff Lawrence E. Wilson in Opposition to Defendant's Second Motion for Summary*

---

[3]On September 20, 2011, defendant was permitted to amend Exhibit B to the *Motion for Summary Judgment*, which mistakenly omitted pages to an affidavit.  *Order*, Doc. No. 123.

*Judgment*, Doc. No. 139 ("*Plaintiff's Supplemental Opposition*"), and defendant filed the *Defendant Leon E. Hill's Reply to Plaintiff's Supplemental Opposition to Defendant's Second Motion for Summary Judgment*, Doc. No. 142 ("*Defendant's Supplemental Reply*"). However, because defendant raised new issues for the first time in *Defendant's Supplemental Reply*, the Court permitted a second round of additional briefing. *Order*, Doc. No. 144. Thereafter, plaintiff filed the *Sur-Reply of Plaintiff Lawrence E. Wilson in Opposition to Defendant's Second Motion for Summary Judgment*, Doc. No. 145 ("*Plaintiff's Sur-Reply*"), and defendant filed the *Defendant Captain Leon Hill's Supplemental Response in Support of Second Motion for Summary Judgment*, Doc. No. 146 ("*Defendant's Response to Sur-Reply*").

Plaintiff has also moved to strike the affidavits of Dr. Clayborn Taylor and Dr. Daniel Clinchot and to exclude their testimony. *See Motion to Strike Taylor Affidavit* and *Motion to Strike Clinchot Affidavit*. All of these motions are fully briefed and ripe for resolution.

## II.    *MOTION TO STRIKE TAYLOR AFFIDAVIT*

Plaintiff has alleged that, as a result of defendant's unlawful excessive force on January 3, 2008, plaintiff has suffered two cracked and/or broken teeth. *Complaint*, p. 4; *Plaintiff Depo*. pp. 24, 28-29, 49, 54. There is no dispute that the two teeth at issue are the left second bicuspid (tooth number 13) and the lower right first molar (tooth number 30). Tooth number 13 was extracted on April 24, 2008 and tooth number 30 was extracted on May 27, 2008. *Affidavit of Clayborn Taylor*, attached as *Exhibit A* to the *Motion for Summary*

4

*Judgment* ("*Taylor Affidavit*"), ¶ 8(I), (j) and document Bates Numbered 177, attached thereto.

On November 1, 2010, defendant disclosed Dr. Clayborn Taylor as one of two "expert witnesses who will offer testimony at the trial of this matter[.]" *Defendant Leon Hill's Disclosure of Expert Testimony*, Doc. No. 74, p. 1 (attaching *Expert Statement of Dr. Clayborn Taylor*, Doc. No. 74-1 ("*Taylor Report*")).  Defendant represents that Dr. Taylor was "not specially retained by Defendant in defense of this action" and that Dr. Taylor "will testify as [a] treating physician[] and expert[]" in his field.  *Id.*  Dr. Taylor is a dentist licensed in Ohio since 1984 who has worked for the Ohio Department of Rehabilitation and Correction ("ODRC") for over five years and who has treated plaintiff's teeth.  *Taylor Report*, ¶¶ 1, 3, 12.

Defendant asked Dr. Taylor to detail his dental examinations and diagnoses of plaintiff and to opine on the cause of the extractions of tooth number 13 and tooth number 30:

> I have been asked to give an account of my dental examinations of inmate Wilson and my diagnosis of his severe dental problems.  I have been asked to describe why two of Inmate Wilson's teeth. . . were extracted on April 24, 2008 and May 27, 2008. . . I have been asked whether the alleged use of force incident that supposedly occurred on January 3, 2008 caused any damage to Inmate Wilson's teeth.  Finally, I have been asked to opine on whether this alleged use of force necessitated the extraction of Inmate Wilson's tooth #13 and tooth #30.

*Taylor Report*, ¶ 3.  Dr. Taylor opined that plaintiff's teeth (tooth number 13 and tooth number 30) were extracted because of decay and periodontitis and not because of trauma.  *Id*. at ¶¶ 6, 8, 12-13.  Dr. Taylor stated that plaintiff "suffered from extreme pain and sensitivity as the result of his periodontitis and chronic decay as

early as the year 2000."  *Id*. at ¶ 9.  According to Dr. Taylor,

> Mr. Wilson's diagnosis of gross and systemic periodontitis
> is based on a system of diagnosis used uniformly throughout
> the U.S. dental community.  The American Academy of
> Periodontology (AAP), a recognized specialty of the American
> Dental Association (ADA), has produced an accepted and
> agreed upon method of diagnosing periodontitis.  Diagnostics
> are based on a classification system defined by Armitage in
> 1999 and subsequently accepted by the American Board of
> Periodontology (ABP), the elite scientific echelon of the
> AAP.  Currently[,] dental students are taught how to
> diagnose periodontitis.  Prior to being awarded licensure in
> the State of Ohio, dentists must pass an exam to prove they
> are competent to diagnose periodontitis.

*Id*. at ¶ 10.

Dr. Taylor further explained that plaintiff's diagnosis of

chronic tooth decay "was based on an equally accepted method of

diagnosis":

> The visual diagnosis method of dental caries has been
> commonly used and widely accepted for more than a century.
> It involves a visual examination of the affected tooth in
> order to determine whether decay has occurred.  If no visual
> indication of decay is present but pain is still felt by the
> patient, the overseeing dentist will administer a diagnosis
> based on the use of x-ray.  The latest contribution to the
> visual diagnostic criteria for tooth decay comes from the
> International Caries Detection and Assessment Criteria
> (ICDAS).  ICDAS was designed to facilitate the standardized
> diagnosis of caries on all tooth surfaces at all stages of
> severity.  An updated version of ICDAS (ICDAS II) has been
> well accepted in the United States and has been used in
> clinical studies.  Additionally, x-ray diagnosis has been
> used pervasively for almost as long as the technology has
> been in existence.

*Id*. at ¶ 11.

Dr. Taylor went on to explain that traumatic tooth loss is very

different from periodontitis and chronic tooth decay "in . . .

symptoms experienced by the patient, the standards utilized in

diagnosis, and the methods used in treatment":

> Although[] the type of traumatic tooth loss alleged by
> Inmate Wilson would be diagnosed visually, the visual

> signature of tooth loss as the result of trauma is radically
> different and readily distinguishable from that of chronic
> tooth decay.  Characteristics of traumatic tooth loss
> include but are not limited to: bruising, bleeding,
> swelling, physical deformation of the tooth itself,
> chipping, cracking, and total or partial tooth loss.  As is
> indicated by Inmate Wilson's medical records, no such
> evidence of trauma existed.  From July of 2000, until the
> present, Inmate Wilson's physical manifestations of his
> dental problems manifested themselves as substantial tooth
> decay, breaking of teeth, pain, and sensitivity.  No
> evidence presented in the medical record and at no point
> during my examination of Inmate Wilson did he present any of
> the symptoms characteristic of traumatic tooth loss.

*Id*. at ¶ 12.  Dr. Taylor concluded that "[t]here is no medical

evidence to support Inmate Wilson's claim that tooth Nos. 13 and 30

were damaged by trauma and then extracted because of the trauma.

These two teeth were extracted on account of severe tooth decay and

periodontitis."  *Id*. at ¶ 13.

In support of the *Motion for Summary Judgment*, defendant offers

the *Taylor Affidavit*, which includes statements and opinions similar

to those contained in the *Taylor Report*.  For example, Dr. Taylor

avers that tooth number 13 and tooth number 30 "were extracted because

of chronic tooth decay and periodontitis, not because of damage caused

by blunt force[,]" explaining that traumatic tooth loss is very

different from periodontitis and chronic tooth decay in terms of a

patient's symptoms, diagnostic standards and treatment.  *Taylor*

*Affidavit*, ¶¶ 3-4.  According to Dr. Taylor, plaintiff's dental file

"reveals that Inmate Wilson has suffered from severe periodontitis and

chronic tooth decay for over a decade."  *Id*. at ¶ 5.  *See also id*. at

¶ 6 (detailing examples "demonstrating the general disrepair of Inmate

Wilson's teeth" other than tooth number 13 and tooth number 30).  Dr.

Taylor also averred that plaintiff "has had a long history of dental

7

problems with his upper left second bicuspid (#13) and lower right first molar (#30)[.]" *Id*. at ¶ 8. In describing these problems, Dr. Taylor specifically avers that he "smoothed down the root tip [of tooth number 13] on May 18, 2006." *Id*. at ¶ 8(I). On May 27, 2008, Dr. Taylor also "personally extracted tooth #30." *Id*. at ¶ 8(j).

Dr. Taylor goes on to aver that there is no evidence of trauma to these teeth and "[n]o evidence presented in the medical record and at no point during my examinations of Inmate Wilson did he present any of the symptoms characteristic of traumatic tooth loss." *Id*. at ¶ 10. Dr. Taylor further avers that

> [t]here is no medical evidence to support Inmate Wilson's claim that tooth Nos. 13 and 30 were damaged by trauma and then extracted because of the trauma. I personally worked on these two teeth and know with 100% certainty that these two teeth were extracted on account of severe tooth decay and periodontitis, not on account of a traumatic injury that allegedly occurred on January 3, 2008.

*Id*. at ¶ 11.

Plaintiff moves to strike the *Taylor Affidavit* and to exclude Dr. Taylor's medical opinions because his testimony is unreliable and unduly prejudicial. *Motion to Strike Taylor Affidavit*.

**A. Dr. Taylor's Causation Opinion as a Treating Provider**

Defendant suggests that Rule 702 of the Federal Rules of Evidence (providing that witnesses who qualify as an expert may testify if they meet certain criteria) does not apply to Dr. Taylor because he is a treating provider testifying about facts based on his personal observation, *i.e.*, a fact witness. Doc. No. 134, pp. 2, 4. Plaintiff disagrees, arguing that (1) a treating provider must tender an expert "disclosure" when offering a causation opinion in anticipation of litigation as opposed to during the course of diagnosis or treatment;

and (2) Dr. Taylor cannot "expand his testimony to include opinions based on a review of other dental records and/or prior experience, without satisfying the requirements of Rule 702." Doc. No. 141, pp. 2-3 (citing, *inter alia*, *Mohney v. USA Hockey, Inc.*, No. 04-3227, 138 Fed. Appx. 804, at *811 (6th Cir. July 14, 2005)).

The Court construes plaintiff's first argument as a challenge to Dr. Taylor's causation opinions based on a failure to produce a report written by Dr. Taylor pursuant to Fed. R. Civ. P. 26(a)(2)(B).[4] That rule requires disclosure of witnesses who are "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." *Id*. A report, which must be prepared and signed by the witness, must accompany this disclosure and must comply with certain requirements. *Id*. However, witnesses who are not "retained or specially employed to provide expert testimony" are not required to provide this written report. Fed. R. Civ. P. 26(a)(2)(C). Instead, Rule 26(a)(2)(C) requires only that a party utilizing the testimony of such a witness disclose: (1) "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705;" and (2) "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C)(I), (ii). Rule

---

[4] Plaintiff apparently relies on *Mohney* for the proposition that, to the extent a treating physician expresses a causation opinion articulated outside the scope of treatment, that physician must produce the report of a specially retained expert. Assuming that *Mohney* stands for the proposition cited, the Court notes that *Mohney* predates the 2010 amendments to Rule 26, which, *inter alia*, added subsection (a)(2)(C) and clarified that a treating provider is not required to produce the detailed report required of a specially retained expert. The Court therefore declines to apply *Mohney* to this case. In any event, the Court is not persuaded that Dr. Taylor, who treated both of plaintiff's teeth, does not qualify as a treating provider for all purposes.

26(a)(2)(C) was promulgated in 2010 in an effort to

> resolve[] a tension that has sometimes prompted
> courts to require reports under Rule 26(a)(2)(B)
> even from witnesses exempted from the report
> requirement.  An (a)(2)(B) report is required
> only from an expert described in (a)(2)(B).

Fed. R. Civ. P. 26(a)(2)(C) Advisory Committee's Notes on 2010

Amendments.  Rule 26(a)(2)(C) witnesses, such as physicians, may

testify as both a fact witness and an expert witness.  *Id.*

Here, Dr. Taylor is a treating dentist who was not "retained or

specially employed to provide expert testimony in this case[.]"

Similarly, Dr. Taylor does not qualify as an employee "whose duties .

. . regularly involve giving expert testimony" as contemplated by the

Rule.  *See Deposition of Dr. Clayborn Taylor*, Doc. No. 117 ("*Taylor

Depo.*"), p. 5[5] (last deposed 18 to 20 years before).  Therefore, it is

the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(C), not those

of Rule 26(a)(2)(B), that apply to Dr. Taylor.  *See also* Fed. R. Civ.

P. 26(a)(2)(C) Advisory Committee's Notes on 2010 Amendments; *Burgess

v. Fischer*, No. 3:10-cv-24, 2012 U.S. Dist. LEXIS 27517, at *2-3 (S.D.

Ohio Mar. 2, 2012) (stating that disclosures of treating physicians

must comply with Rule 26(a)(2)(C)).

As discussed *supra*, defendant previously disclosed Dr. Taylor and

Dr. Daniel Michael Clinchot as witnesses.  *Defendant Leon Hill's

Disclosure of Expert Testimony*, Doc. No. 74.  Defendant represented

that these witnesses "will testify as treating physicians and experts

in their respective fields" and attached reports for both these

witnesses.  *Id.*  Plaintiff has not specified any deficiency in this

---

[5]This deposition was filed under seal.  However, the quoted excerpts
contained herein do not contain personal identifying information.

disclosure under Rule 26(a)(2)(C). The Court concludes that defendant has properly disclosed Dr. Taylor as a non-specially retained expert witness.

The Court next addresses the parties' dispute as to whether Dr. Taylor's testimony is subject to Rule 702. Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the testimony meets certain requirements. By disclosing Dr. Taylor pursuant to Fed. R. Civ. P. 26, defendant has already implicitly conceded that Rule 702 applies, at least in some measure, to Dr. Taylor's testimony. *See* Fed. R. Civ. P. 26(a)(2)(A), (C)(I). Moreover, the United States Court of Appeals for the Sixth Circuit has held that a treating provider's testimony is subject to the reliability requirements set forth in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). *Gass v. Marriot Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009). *See also Thomas v. Novartis Pharm. Corp.*, Nos. 09-6147, 09-6272, 09-6274, 443 Fed. Appx. 58, at *61 (6th Cir. Aug. 23, 2011). This Court therefore rejects defendant's contention that Dr. Taylor's testimony is not subject to Rule 702 simply by virtue of his status as a treating dentist.

### B. Reliability

Invoking Fed. R. Evid. 702, plaintiff seeks to strike the *Taylor Affidavit* and to preclude Dr. Taylor from offering "unreliable" expert testimony.

### 1. Standard

11

The United States Supreme Court has held that the Federal Rules of Evidence, particularly Rule 702, require the trial court to act as a gatekeeper of expert evidence. *Daubert*, 509 U.S. at 597. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (stating that the gatekeeper function applies to all expert testimony).  Rule 702 specifically provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Civ. P. 702.  As the gatekeeper, a trial court must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  A trial court has broad discretion when carrying out its gatekeeping function. *Nolan v. Memphis City Sch.*, 589 F.3d 257, 265 (6th Cir. 2009) ("Broad discretion is given to district courts in determinations of admissibility . . . and those decisions will not be lightly overturned.") (quoting *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004)) (internal quotation marks omitted).

The Sixth Circuit has construed *Daubert* to mandate a two-step inquiry. *See United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000).  First, as to reliability, a trial court must preliminarily assess whether the underlying reasoning or methodology of the proffered expert testimony is scientifically valid. *Id.* (quoting

*Daubert*, 509 U.S. at 592-93).  That is, expert testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (explaining the meaning of the term "scientific knowledge" as contemplated in Rule 702).  *Daubert* provided four non-exclusive factors to assist the trial court's determination of reliability:  (1) whether a "theory or technique . . . can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) whether the technique has a high "known or potential rate of error" and whether standards controlling the technique's operation exist; and (4) whether the theory or technique has been generally accepted by the relevant scientific community.  *Id*. at 592-94.  The Sixth Circuit has "recognized that the *Daubert* factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 682 (6th Cir. 2010) (quoting *In re Scrap Metal*, 527 F.3d 517, 529 (6th Cir. 2008)).  *See also Kumho Tire*, 526 U.S. at 150 (stating that the trial judge may consider one or more of the *Daubert* factors, which may or may not be pertinent depending on the particular case, in assessing reliability).  The inquiry as to reliability is therefore "very flexible[.]" *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007).

Second, a trial court must determine whether the proposed expert testimony is relevant and will assist the trier of fact.  *Smithers*, 212 F.3d at 313 (citing *Daubert*, 509 U.S. at 592-93).  That is, "there must be a 'fit' between the inquiry in the case and the testimony[.]" *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993).

"In short, under *Daubert* and its progeny, a party proffering

13

expert testimony must show by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000)) (internal quotation marks omitted).

### 2.  Discussion

In support of his contention that Dr. Taylor's opinions are based on unreliable methodology, plaintiff advances two arguments:  (1) the *Taylor Report* purports to diagnose plaintiff's periodontitis based on "the Armitage classification system," *i.e.*, a system with which Dr. Taylor is not familiar; and (2) defendant has not produced any dental records diagnosing plaintiff, prior to January 3, 2008, with periodontitis or chronic tooth decay.  *Motion to Strike Taylor Affidavit*, pp. 4-6; *Reply of Plaintiff Lawrence E. Wilson in Support of Motion to Strike the Affidavit of Dr. Clayborn Taylor and to Exclude His Medical Opinions*, Doc. No. 141, pp. 3-4.  The Court shall address each argument in turn.

### a.  "Armitage classification system"

Dr. Taylor avers that plaintiff's tooth number 13 had deteriorated to nothing more than a root tip that he smoothed down on May 18, 2006.  *Taylor Affidavit*, ¶ 8(I).  According to Dr. Taylor, tooth number 13 was later extracted by another dentist on April 24, 2008 "because dental disease and a tooth fracture diagnosed on November 18, 2005 had decayed the tooth to nothing more than a sanded

down root tip." *Id.* Dr. Taylor personally extracted tooth number 30 on May 27, 2008, because of "gross decay. At the time of the extraction, there was no sign of trauma. It was extracted because of its continued deterioration caused by severe decay and periodontitis." *Id.* at ¶ 8(j). In sum, Dr. Taylor "know[s] with 100% certainty that these two teeth were extracted on account of severe tooth decay and periodontitis, not on account of a traumatic injury that allegedly occurred on January 3, 2008." *Id.* at ¶ 11.

Addressing plaintiff's diagnosis of periodontitis, the *Taylor Report* states that "[d]iagnostics are based on a classification system defined by Armitage in 1999[.]" *Taylor Report*, ¶ 10. When questioned during his deposition about this statement, Dr. Taylor could not describe what plaintiff's counsel characterized as the "Armitage classification system":

> Q: At the beginning of that, towards the beginning of that paragraph [paragraph 10 of the *Taylor Report*], you talk about the Armitage classification system?
>
> A: Okay.
>
> Q: Can you describe that for me, what that is?
>
> A: No.
>
> Q: Okay. So you don't know if that classification system was followed in this case, in order to diagnose Mr. Wilson with periodontitis, correct?
>
> A: No, I don't.

*Taylor Depo.*, pp. 60-61.

However, Dr. Taylor went on to explain another method of diagnosing periodontitis:

> Q: Aside from the Armitage method or classification system, are you aware of any other method to diagnose periodontitis?

15

A:    I had just -- clinical exam and radiographic exam.

  *              *              *              *

Q:    Sure.  Other than this Armitage classification system,
      you mentioned that periodontitis can be diagnosed
      through clinical examination and radiographic
      examination?

A:    Yes.

Q:    My question to you is, what do you need to see in your
      clinical and/or radiographic examination to allow you
      to make that diagnosis?

A:    Yeah, it's based upon bone loss.

Q:    Okay.  And how do you do that clinically?

A:    You can do it with a -- with a periodontal probe,
      visual exam, periodontal probe, radiographically, with
      radiographs.

Q:    Okay.  Do you know if, in fact, that process has
      occurred in this case in order to diagnose Mr. Wilson
      with periodontitis?

A:    Physical examination and radiographic examination,
      yes.

Q:    Who, do you know who, if it wasn't yourself, did that
      clinical exam and/or radiographic exam?

A:    No.

Q:    Okay.  Would it be fair to say that you didn't do that
      clinical exam and radiographic exam in order to
      diagnose periodontitis?

A:    I didn't, I don't think I indicated anywhere that I
      did an exam and just specifically for that, as a
      general statement, yes, you know, you see these things
      that are evident.

*Taylor Depo.*, pp. 61-63.

     A fair reading of Dr. Taylor's entire deposition makes clear

that, although Dr. Taylor did not recognize the word "Armitage" or the

term "Armitage classification system," he did identify a method of

16

diagnosing periodontitis through clinical and radiographic examinations. Plaintiff concedes as much, acknowledging that Dr. Taylor explained that periodontitis can be diagnosed through this method. *Motion to Strike Taylor Affidavit*, p. 5.

Similarly, Dr. Taylor's report explained that plaintiff's diagnosis of chronic tooth decay "was based on an equally accepted method of diagnosis" that includes a visual examination and x-rays. *Taylor Report*, ¶ 11. Dr. Taylor elaborated on this method of diagnosing chronic tooth decay in his deposition:

> Q:   Okay.  In the next paragraph of your report, paragraph No. 11, the first sentence -- well, let me, I will let you take a look at that before asking questions.
>
> A:   Okay.
>
> Q:   You talk about, quote, equally accepted method, end quote, for diagnosing chronic tooth decay.
>
>      My question is, what is that equally accepted method, that's the first sentence, by the way?
>
> A:   Okay.  Equally accepted method, tooth decay is based upon radiographic examination and a visual exam.
>
> Q:   Okay.  And did you conduct any -- a clinical exam and/or radiographic exam of Mr. Wilson in this case sufficient to allow you to diagnose Mr. Wilson with chronic tooth decay?
>
> A:   Yes.
>
> *              *              *              *
>
> Q:   As you sit here today, do you recall specifically reviewing radiographs that would allow you to diagnose, or to aid in your diagnosis of the chronic tooth decay?
>
> A:   Yes.
>
> Q:   Do you have a recollection of the number of x-rays, radiographs that you reviewed?
>
> A:   Just when I reviewed my notes, at least the panorex and four

bitewings.

*Taylor Depo.*, pp. 63-64.

Later in his deposition, Dr. Taylor confirmed that a clinical and radiographic exam is an objective method of diagnosing periodontitis and chronic tooth decay:

> Q:   Dr. Taylor, would you agree that an x-ray would provide objective evidence to support a conclusion that either Mr. Wilson had or didn't have periodontitis or chronic tooth decay, either before-before the teeth were extracted in April and May of 2008?
>
> A:   Yeah, an x-ray would support that.
>
> Q:   Okay.  And other than a clinical examination, there is really no other objective way to verify that?
>
> A:   Clinical and radiographic, yes.

*Taylor Depo.*, p. 70.

Dr. Taylor is a dentist licensed by the State of Ohio since 1984 who has worked for the ODRC for over five years and who provided dental treatment to plaintiff's teeth.  *Taylor Report*, ¶¶ 1, 3, 12; *Taylor Affidavit*, ¶ 2.  Dr. Taylor has identified an objective method of diagnosing periodontitis and chronic tooth decay apart from the "Armitage classification system."  There is no evidence before the Court, or even argument, that a visual clinical exam combined with a radiographic exam is an unacceptable or unreliable method of diagnosis.  Moreover, the Sixth Circuit has previously acknowledged that "[a]dmissibility under Rule 702 does not require perfect methodology."  *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181-82 (6th Cir. 2009) (permitting testimony where physician "performed as a competent, intellectually rigorous treating physician in identifying the most likely cause of [plaintiff's] injury").  Under these

18

circumstances, the Court cannot conclude that Dr. Taylor's inability to explain the word "Armitage" as utilized in his report is fatal or that the alternative method of diagnosis described by Dr. Taylor, an experienced dentist, and utilized in this case is unreliable and therefore inadmissible. *See*, *e.g.*, *Johnson*, 484 F.3d at 430 (stating that the inquiry as to reliability is "very flexible"); *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("[A]ny weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility.").

Moreover, Rule 26(a)(2) itself further supports the Court's conclusion that Dr. Taylor's failure to recognize the word "Armitage," as used in his report, is not fatal to his testimony. As discussed *supra*, a non-specially retained treating provider, such as Dr. Taylor, need not personally prepare his own report. *See* Fed. R. Civ. P. 26(a)(2)(c). Dr. Taylor's failure to recognize one particular term appearing in that report, therefore does not render Dr. Taylor's testimony as an expert so unreliable as to preclude his testimony.

### b. No dental records diagnosing plaintiff with periodontitis or chronic tooth decay prior to January 3, 2008

Plaintiff next argues that the Court should exclude Dr. Taylor's testimony because defendant has not produced any dental records diagnosing plaintiff, prior to January 3, 2008, with periodontitis or chronic tooth decay. *Motion to Strike Taylor Affidavit*; Doc. No. 141, pp. 3-4. For example, plaintiff contends that ODRC policy requires that either a panoramic or periapical x-ray be taken before a tooth is extracted. *Id.* at 4 (citing *Taylor Depo.*, pp. 23-24, 26, 43).

19

Plaintiff complains that none of the bitewing radiographs that defendant belatedly produced and upon which Dr. Taylor purportedly relied "have been taken on the days Mr. Wilson had tooth No. 13 or tooth No. 30 extracted." *Id.* at 3-4. Therefore, plaintiff argues, there is no objective basis for confirming or refuting the conclusion that tooth number 13 and tooth number 30 were extracted because of periodontitis and/or chronic tooth decay. *Id.* at 4.

This Court disagrees. "An expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000) (quoting *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (E.D. Mich. 1995)). "Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded." *L.E. Cooke Co.*, 991 F.2d at 342. Here, Dr. Taylor's opinions are not mere speculation and enjoy reasonable support in the record. For instance, Dr. Taylor has identified specific dental records containing clinical exams and/or radiographic exams that support his diagnosis of periodontitis and/or chronic tooth decay. *See Taylor Report*, ¶¶ 5-6, 8; *Taylor Affidavit*, ¶¶ 5-8; *Taylor Deposition*, pp. 32-56; 63-64.

Moreover, although plaintiff specifically complains that none of the x-rays recently produced appear to have been taken on the days that plaintiff's teeth were actually extracted, the Court notes that Dr. Taylor's testimony does not support plaintiff's contention that ODRC policy requires that x-rays be taken on the day of the extraction. *See Taylor Depo.*, p. 43 (suggesting that x-rays taken

20

within six months to a year prior to an extraction are considered recent). Regardless, to the extent that plaintiff complains that defendant has not sufficiently explained how certain x-rays support Dr. Taylor's diagnoses, this criticism would go to the weight of the evidence rather than to its admissibility. *See*, *e.g.*, *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531-32 (6th Cir. 2008) (stating that questions as to accuracy of expert opinion went to the weight of the evidence rather than to its admissibility); *L.E. Cooke Co.*, 991 F.2d at 342. *See*, *e.g.*, *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

        C.   **Prejudice**

        In his *Motion to Strike Taylor Affidavit*, plaintiff initially argued that the Court should strike Dr. Taylor's testimony as prejudicial because defendant failed to produce the x-rays relied upon by Dr. Taylor. *Id*. at 6. However, defendant later produced those x-rays and plaintiff appears to have abandoned this argument as a basis for excluding Dr. Taylor's testimony. Doc. No. 134, p. 3; Doc. No. 141. Although the Court does not condone defendant's inexplicably untimely disclosure of the x-rays, the Court cannot conclude that defendant's belated production provides a basis for excluding Dr. Taylor's testimony under Fed. R. Evid. 403. Plaintiff has now been afforded the opportunity to evaluate Dr. Taylor's testimony in light of this evidence and, as discussed *supra*, plaintiff's criticism of Dr. Taylor's testimony would address merely the weight, rather than the admissibility, of that testimony. Accordingly, under these

circumstances, the Court concludes that its broad discretion, *see Nolan v. Memphis City Sch.*, 589 F.3d 257, 265 (6th Cir. 2009), is better exercised in permitting Dr. Taylor's testimony.

**III.  *MOTION TO STRIKE CLINCHOT AFFIDAVIT***

Plaintiff alleges that, as another result of the incident of January 3, 2008, "both of his hands have been diagnosed with nerve damage (carpal tunnel) . . . ." *Complaint*, p. 4. On November 1, 2010, defendant disclosed Daniel Michael Clinchot, M.D., as one of two "expert witnesses who will offer testimony at the trial of this matter[.]" *Defendant Leon Hill's Disclosure of Expert Testimony*, p. 1 (attaching report of Dr. Clinchot, Doc. No. 74-2 ("*Clinchot Report*")). Defendant represents that Dr. Clinchot was "not specially retained by Defendant in defense of this action" and that Dr. Clinchot "will testify as [a] treating physician[] and expert[]" in his field.  *Id.* In support of the *Motion for Summary Judgment*, defendant also offers the *Affidavit of Daniel M. Clinchot*, ¶ 2, attached as *Exhibit B* to the *Motion for Summary Judgment* ("*Clinchot Affidavit*").

Dr. Clinchot is a medical doctor specializing in physical medicine and rehabilitation who has worked at the Ohio State University School of Medicine, College of Medicine, Department of Physical Medicine and Rehabilitation, for the last 18 years.  *Id.* at ¶ 2.  Dr. Clinchot, certified by the American Board of Electrodiagnostic Medicine since 1994, serves as an associate professor in the College of Medicine.  *Id.*  He is also the current Associate Program Director for the Ohio State University's Department of Physical Medicine and Rehabilitation as well as the Associate Dean of the College of

22

Medicine.  *Id*.  Dr. Clinchot has performed "electrodiagnostic studies
on the general population and on inmates since 1992[,]" performing
"well over 8500 electrodiagnostic studies on inmates" and has
"diagnosed nerve injuries in inmates that were most likely the result
of handcuffs." *Clinchot Report*, p. 1.  According to Dr. Clinchot,
"[t]he prevalence of carpal tunnel syndrome in the general population
is about 50 cases per 1000 subjects." *Clinchot Affidavit*, ¶ 4.

In explaining carpal tunnel syndrome, Dr. Clinchot describes the
three different nerves in the hand and wrist:

> Carpal tunnel syndrome is a compression of one of the nerves
> in the wrist called the Median nerve.  There are three major
> nerves that enter the hand through the wrist.  The Ulnar
> nerve[] runs along the side of the wrist that is in line
> with the little finger.  The Superficial Radial Sensory
> nerve which runs alongside the side of the wrist [is] in
> line with the thumb.  The Median nerve[] runs through the
> center of the wrist.

*Id*. at ¶ 3.  According to Dr. Clinchot, "handcuff injuries almost
always involve the Superficial Radial Sensory nerve" because this
nerve

> lies very superficially in the wrist and is at high risk to
> be compressed against the bone by a handcuff.  This
> compression when significant enough will result in injury to
> the Superficial Radial Sensory nerve.  Additional injuries
> can be seen in severe prolonged cases of handcuff
> compression.

*Id*. at ¶ 5.

Dr. Clinchot is unaware of any handcuff compression that injures
only the Median nerve:

> Injuries have been reported in the medical literature to
> involve the Superficial Radial Sensory nerve and the Ulnar
> nerve together, the Superficial Radial Sensory nerve, the
> Ulnar nerve and the Median nerve together, and the
> Superficial Radial Sensory nerve and Median nerve together.
> I know of no cases in my career or in the medical literature
> that describes an isolated case of Medial nerve injury from

23

a handcuff.  This is because from a biomechanical standpoint
the Median nerve is deep in the wrist and relatively
protected by layers of tissue unlike the Superficial Radial
Sensory nerve.

*Id*. at ¶ 6.

After performing an electrodiagnostic study on plaintiff on May
14, 2008, Dr. Clinchot's diagnosis was not consistent with a handcuff
injury:

The study revealed electrodiagnostic evidence for Mild-
Moderate Carpal Tunnel Syndrome.  This diagnosis is
inconsistent with a handcuff injury.  The Superficial Radial
Sensory nerve studies were normal as were the Ulnar nerve
studies.  If inmate Wilson had a handcuff compression that
was severe enough to cause a Median nerve injury it would
have been severe enough to cause compression of the
Superficial Radial Sensory nerve as well.  The way in which
the even circumferential compression of the metal of a tight
handcuff across the wrist is distributed it would have
additionally caused injury to the Superficial Radial Sensory
nerve if it was severe enough to cause injury to the Median
nerve.

*Id*. at ¶ 7.

Dr. Clinchot concluded that plaintiff suffers from idiopathic
Carpal Tunnel Syndrome, a diagnosis that is inconsistent with a
handcuff injury.  *Id*. at ¶ 9.  Dr. Clinchot also refers to plaintiff's
prison medical records, which document plaintiff's complaints of
"right wrist pain with loss of sensation to the fingertips" prior to
the date of the alleged injury on January 3, 2008, as further support
for his diagnosis of idiopathic carpal tunnel syndrome.  *Id*. at ¶ 8.

Plaintiff moves to strike the *Clinchot Affidavit* and to exclude
Dr. Clinchot's medical opinions because his testimony is unreliable
and unduly prejudicial.  *Motion to Strike Clinchot Affidavit*.

**A.    Dr. Clinchot's Causation Opinion as a Treating Physician**

In seeking to strike the *Clinchot Affidavit*, plaintiff does not

24

challenge Dr. Clinchot's general qualifications nor does plaintiff seek to preclude Dr. Clinchot's explanation as to the testing he performed and the conclusion that the study showed evidence of carpal tunnel syndrome. *Motion to Strike Clinchot Affidavit*, pp. 4-6; Doc. No. 140, pp. 1-3. Instead, plaintiff contends that, because Dr. Clinchot was not treating plaintiff and therefore had no reason to explore the issue of causation, Dr. Clinchot may not offer causation opinions formed in the context of litigation "without tendering an expert disclosure." Doc. No. 140, pp. 2-3.

This Court disagrees. First, the record supports a finding that Dr. Clinchot acted as plaintiff's treating physician. Plaintiff testified that, following the incident of January 3, 2008, he sought medical treatment for pain in his hands. *Plaintiff Depo.*, pp. 50-51; *Exhibit 7*, attached thereto (containing plaintiff's medical record dated April 5, 2008, noting plaintiff's complaint of pain in his hands and burning and tingling in his forearm(s)). Plaintiff also testified that he saw a doctor on May 14, 2008. *Plaintiff Depo.*, pp. 50-51. On that same date, Dr. Clinchot – who performs diagnostic studies at Correction Medical Center ("CMC") upon referral by an institution doctor or consultant. *Clinchot Deposition*, pp. 27-28 – saw plaintiff, performed an electrodiagnostic study and diagnosed plaintiff with bilateral Mild-Moderate Carpal Tunnel Syndrome. *Deposition of Daniel Michael Clinchot, M.D.*, Doc. No. 116,[6] pp. 27, 32, 34 ("*Clinchot Depo.*"); *Exhibit 4*, attached thereto (electrodiagnostic study dated May 14, 2008 diagnosing plaintiff with "Bilateral Mild-Moderate Carpal

---

[6]This deposition was filed under seal. However, the quoted excerpts contained herein do not contain personal identifying information.

Tunnel Syndrome"). Although Dr. Clinchot could not recall how the specific request for testing plaintiff came about, he testified that he usually visits CMC one day per week and is provided a schedule that lists the names of inmates whom he will see. *Id*. at 27-28, 30.

The evidence before this Court establishes that (1) plaintiff complained of pain in his hands and forearm(s) and sought medical treatment prior to being seen by Dr. Clinchot; (2) Dr. Clinchot, who performs diagnostic studies at the request of CMC physicians or consultants, administered such a test to plaintiff on May 14, 2008, and diagnosed carpal tunnel syndrome on the same day; and (3) plaintiff did not file the *Complaint* until June 10, 2008. Under these circumstances, the Court concludes that Dr. Clinchot is appropriately characterized as plaintiff's treating physician.

Second, plaintiff's argument that Dr. Clinchot cannot offer causation testimony without first tendering an expert "disclosure," Doc. No. 140, pp. 2-3 ((citing, *inter alia*, *Mohney v. USA Hockey, Inc.*, No. 04-3227, 138 Fed. Appx. 804, at *811 (6th Cir. July 14, 2005)), fails for the same reasons discussed *supra* in connection with Dr. Taylor's testimony. On November 1, 2010, defendant disclosed Dr. Clinchot as an expert witness and produced the *Clinchot Report*, which contains Dr. Clinchot's *curriculum vitae*. *Defendant Leon Hill's Disclosure of Expert Testimony*. Nowhere has plaintiff explained how this disclosure fails to comport with the requirements of Fed. R. Civ. P. 26(a)(2)(c) relating to non-specially retained experts. Under these circumstances, Dr. Clinchot's testimony will not be foreclosed because of a failure to comply with the requirements of Fed. R. Civ. P. 26(a)(2).

26

**B.    Reliability**

Plaintiff also argues that Dr. Clinchot's causation testimony is unreliable because his study was incomplete.  *Motion to Strike Clinchot Affidavit*, pp. 4-6.  More specifically, plaintiff complains that Dr. Clinchot failed to require plaintiff to complete a pre-study form, to discuss plaintiff's medical history, or to ask plaintiff about the alleged cause of plaintiff's pain.  Plaintiff also criticizes Dr. Clinchot's failure to perform a needle electromyography, a test that could purportedly either confirm or rule out the existence of cervical radiculopathy.[7]  As a result of these omissions, plaintiff argues, Dr. Clinchot can say only that, on the date of the study, testing documented Mild-Moderate Carpal Tunnel Syndrome. According to plaintiff, Dr. Clinchot cannot say whether plaintiff suffered some other condition. Plaintiff therefore argues that Dr. Clinchot cannot opine, with any reliability, that plaintiff's carpal tunnel syndrome is inconsistent with a handcuff injury.

Plaintiff's arguments are not well-taken.  First, an expert is permitted to "tie observations to conclusions through the use of . . . general truths derived from . . . specialized experience." *Kumho Tire,* 526 U.S. at 148 (internal quotation marks omitted).  *See also* Fed. R. Evid. 702 advisory committee's note on 2000 amendments ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.").  When an expert relies

_____

[7]Cervical radiculopathy is a dysfunction of a nerve root of the cervical spine, which plaintiff suggests could have caused his pain.  Plaintiff contends that the failure to perform a needle electromyography is significant because Dr. Clinchot admitted that cervical radiculopathy could be caused by being slammed against a wall.

"solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (quoting Fed. R. Evid. 702 advisory committee's note). Here, Dr. Clinchot, whose qualifications are not challenged by plaintiff, has done exactly that. According to Dr. Clinchot, carpal tunnel syndrome is a compression of the Median nerve in the wrist. *Clinchot Affidavit*, ¶ 3. Conversely, injuries resulting from the use of handcuffs "almost always involve the Superficial Radial Sensory nerve" because that nerve "lies very superficially in the wrist and is at high risk to be compressed against the bone by a handcuff." *Id.* at ¶ 5. Dr. Clinchot further averred that he knows "of no cases in my career or in the medical literature that describes an isolated case of Medial nerve injury from a handcuff." *Id.* at ¶ 6. After performing the electrodiagnostic study on May 14, 2008, which revealed that plaintiff's Superficial Radial Sensory nerve and Ulnar nerve were normal, Dr. Clinchot diagnosed Mild-Moderate Carpal Tunnel Syndrome. *Id.* at ¶ 7. Dr. Clinchot also concluded, based on these findings, that plaintiff's diagnosis is inconsistent with a handcuff injury. *Id.* at ¶¶ 7, 9. Under these circumstances, the Court concludes that Dr. Clinchot, in opining as to causation, properly relied on his experience and applied that experience to the facts in this case. *See*, *e.g.*, *Kumho Tire,* 526 U.S. at 148; *Thomas*, 398 F.3d at 432.

Second, the Court is not persuaded by plaintiff's argument that

28

Dr. Clinchot's failure to perform a differential diagnosis[8] and to eliminate other causes of plaintiff's pain, such as cervical radiculopathy, is fatal to Dr. Clinchot's testimony. A differential diagnosis is simply one of the acceptable methods that may be used in determining causation. *See*, *e.g.*, *Hardyman*, 243 F.3d at 260 ("One appropriate method for making a determination of causation for an individual instance of disease is known as 'differential diagnosis.'"); *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 178 (6th Cir. 2009) (same). Plaintiff points to no authority that requires the differential diagnosis method as a predicate to the admission of a physician's testimony. Indeed, "in order to be *admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (emphasis in original) (quoting *Jahn v. Equine Servs, PSC*, 233 F.3d 382, 388 (6th Cir. 2000)) (internal quotation marks omitted). *See also Daugherty v. Chubb Group of Ins. Cos.*, No. 3:08-CV-48-R, 2011 U.S. Dist. LEXIS 131679, at *20 (W.D. Ky. Nov. 14, 2011) ("[T]he *Best* opinion does not stand for the proposition that a doctor offering an opinion as to causation must use a differential diagnosis in forming that opinion. . . . The *Best* Court did not hold that differential diagnosis is the only method doctors could use when forming causation opinions."). Accordingly, Dr.

---

[8]A differential diagnosis is "the method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 214 (1994) (internal quotation marks omitted)).

Clinchot's failure to rule out cervical radiculopathy, or other causes, as the source of plaintiff's pain does not render Dr. Clinchot's testimony unreliable.

Finally, plaintiff complains that Dr. Clinchot failed to take plaintiff's medical history, to discuss plaintiff's cause of pain or to otherwise require plaintiff to complete any questionnaire before conducting the diagnostic study. Plaintiff offers no authority that such failures serve to preclude otherwise reliable expert testimony. This Court concludes that they do not. As with Dr. Taylor, plaintiff will have the opportunity at trial to attack Dr. Clinchot's opinion, but the Court will not bar his testimony. *See, e.g.*, *Daubert*, 509 U.S. at 596.

### C. Prejudice

Plaintiff also argues that Dr. Clinchot's testimony is prejudicial and should be excluded under Fed. R. Civ. P. 403 because the Court did not assure that plaintiff's expert was given the opportunity to replicate Dr. Clinchot's tests or otherwise perform "more complete testing." *Motion to Strike Dr. Clinchot's Affidavit*, p. 6.

A court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Fed. R. Evid. 403. "In order to establish that the evidence should be excluded, it is not sufficient to suggest that the 'legitimate probative force of the evidence' would result in damage to the [party's] case, but rather that the evidence would 'tend[] to suggest [a] decision on an improper basis.'" *United States v. Poulsen*, 655 F.3d 492, 509 (6th Cir. 2011) (quoting *United States v. Newsom*, 452

30

F.3d 593, 603 (6th Cir. 2006)). The availability of other types of proof is one factor to be considered when balancing unfair prejudice against probative value under Rule 403. *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996). A district court has broad discretion when making this Rule 403 determination, considering the evidence "in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Poulsen*, 655 F.3d at 509 (internal quotation marks omitted).

On February 4, 2011, plaintiff's counsel issued a *subpoena duces tecum* to ODRC, commanding that ODRC transport plaintiff to a private doctor's office in Gahanna, Ohio, for a physical examination. *See Exhibit 1* attached to *Motion to Quash Subpoena*, Doc. No. 93. ODRC filed a motion to quash that subpoena, which motion was granted. *Opinion and Order*, Doc. No. 105. In concluding that the requested subpoena would unduly burden ODRC and would create an unnecessary and substantial security risk, the Court also found no authority in support of plaintiff's use of a subpoena under Fed. R. Civ. P. 45. *Id.* at 3. Decisions from other circuits supported the Court's conclusion. *Id.* at 3-4 (citing *Ivey v. Harney*, 47 F.3d 181 (7th Cir. 1995) (holding that requiring a correctional institution to transport an inmate for an independent medical examination to support his § 1983 claim is not authorized by either the habeas corpus statute or the All Writs Act)).

The Court concludes that Dr. Clinchot's testimony is not prejudicial simply because the Court denied plaintiff's request for his own additional medical exam. Here, all the information relied

upon by Dr. Clinchot, plaintiff's treating physician, is also available to plaintiff and to any expert utilized by plaintiff. This factor weighs in favor of admissibility. *Cf*. *Merriweather*, 78 F.3d at 1077.  Moreover, plaintiff will have the opportunity to challenge the sufficiency of Dr. Clinchot's opinion through vigorous cross-examination.  The Court cannot conclude that the prejudicial value of Dr. Clinchot's testimony substantially outweighs its probative value.

**IV.** ***MOTION FOR SUMMARY JUDGMENT***

Defendant has moved for summary judgment on plaintiff's claim of excessive force in violation of plaintiff's rights under the Eighth Amendment.

**A.    Standard**

The standard for summary judgment is well established.  This standard is found in Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  In making this determination, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).  Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).  However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322 (1986).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party.  *Anderson,* 477 U.S. at 251.

The party moving for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  *Catrett,* 477 U.S. at 323.  Once the moving party has met its initial burden, the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson,* 477 U.S. at 250 (quoting former Fed. R. Civ. P. 56(e)); *Talley v. Bravo Pitino Restaurant*, *Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995) ("[T]he nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial.").  "Once the burden of production has so shifted, the party opposing summary judgment cannot rest on the pleadings or merely reassert the previous allegations.  It is not sufficient to 'simply show that there is some metaphysical doubt as to the material facts.'"  *Glover v. Speedway Super Am. LLC,* 284 F.Supp.2d 858, 862 (S.D. Ohio 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, the nonmoving party must support the assertion that a fact is genuinely disputed.  Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Glover,* 284 F.Supp. 2d at 862 (citing *InteRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989)).  Instead, a "court is entitled to

33

rely, in determining whether a genuine issue of material fact exists
on a particular issue, only upon those portions of the verified
pleadings, depositions, answers to interrogatories and admissions on
file, together with any affidavits submitted, specifically called to
its attention by the parties." *Id.* *See also* Fed. R. Civ. P.
56(c)(3).

**B.  Discussion**

Plaintiff alleges that defendant used excessive force against him
on January 3, 2008.  An inmate's claim of excessive force is properly
raised under the Eighth Amendment's cruel and unusual punishment
clause. *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002)
(quoting *Pelfrey v. Chambers*, 43 F.3d 1034, 1036-37 (6th Cir. 1995)).
The Eighth Amendment, which applies to the states through the Due
Process Clause of the Fourteenth Amendment, *Robinson v. California*,
370 U.S. 660, 666 (1962), prohibits the infliction of "cruel and
unusual punishments" on those convicted of crimes.  U.S. Const. amend.
VIII.  In order to be found liable for a violation of the Eighth
Amendment, a prison official must have acted with "a sufficiently
culpable state of mind and [] the alleged wrongdoing [must be]
objectively harmful enough to establish a constitutional violation."
*Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (internal quotation marks
omitted).

A claim of excessive force by a prison official under the Eighth
Amendment contains both an objective and subjective component, *Moore
v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993).  As to the subjective
component, a court must determine "'whether force was applied in a
good-faith effort to maintain or restore discipline or maliciously and

34

sadistically to cause harm.'" *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (quoting *Hudson*, 503 U.S. at 7). *See also Hasenmeier-McCarthy v. Rose*, 986 F. Supp. 464, 470-71 (S.D. Ohio 1998) ("[A]n Eighth Amendment claimant can satisfy this heightened subjective requirement by proving that prison officials 'used force with a knowing willingness that [harm will] occur.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). In making this determination, courts may consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)) (internal quotation marks omitted). "Courts may also consider the circumstances as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.* (quoting *Whitley*, 475 U.S. at 321) (internal quotation marks omitted).

The objective component requires that the pain be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). This component is "contextual and responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* "[A]lthough the injury sustained by the inmate must be more than *de minimis*, it need not be particularly serious in order to sustain an Eighth Amendment claim." *Thaddeus-X v. Blatter*, 175 F.3d 378, 402 (6th Cir. 1999).

In the case presently before the Court, the parties dispute the amount of force defendant used against plaintiff on January 3, 2008.

Defendant contends that plaintiff became argumentative about being on his bed and that defendant conducted a pat down and handcuffed plaintiff. *Hill Depo.*, p. 26. Although plaintiff physically complied with defendant's commands, defendant testified that plaintiff continued to be verbally argumentative in front of other inmates. *Id.* at 26-27, 32-35. Defendant specifically contends that plaintiff said in a loud voice, "I don't care about you, you can do what you have to do." *Id.* at 34 and *Exhibit 3*, attached thereto. Because of this misconduct, defendant escorted plaintiff, still handcuffed, out of the unit. *Id.* at 26-27, 32-35. Defendant specifically denies that, while walking with plaintiff, he pushed plaintiff into a wall. *Id.* at 36-37; 59-60.

Plaintiff testified that defendant forcefully kicked plaintiff's feet apart when conducting the pat down, twice pushed plaintiff face-first into a wall and handcuffed him so tightly that the handcuffs cut off plaintiff's circulation. *Plaintiff Depo.*, pp. 22-25; *Plaintiff Affidavit*, ¶ 2. According to plaintiff, defendant also purposely pushed plaintiff face-first into a corner of a wall when escorting plaintiff out of the unit. *Id.* Plaintiff also offers the affidavits of other witnesses who support plaintiff's version of the incident. *See Exhibits* A, B and C, attached to the *Motion for Summary Judgment*. Moreover, Mohammed Yakubu, PCI's institutional inspector who investigated the incident and documented his findings, reported that use of force was involved on January 3, 2008 in light of the fact that plaintiff was handcuffed. *Deposition of Mohammed Yakubu*, pp. 52-54, Doc. No. 112 ("*Yakubu Depo.*") and *Exhibit 2*, attached thereto.

As noted *supra*, defendant concedes that plaintiff physically

36

complied with defendant's commands and it was only plaintiff's verbal response that precipitated the application of handcuffs. Yet, when asked on deposition at what point a verbal disturbance necessitates the use of force, defendant responded, "[A] riot situation or enticing other inmates to participate in some type of disturbance." *Hill Depo.*, pp. 55-57. Defendant also agreed that the incident did not involve the inciting of a riot. *Id.* Considering the totality of the evidence in this regard, the Court concludes that plaintiff's version of the facts, if credited, could support a finding that excessive force was applied during the incident. The record therefore reflects a genuine issue as to this material fact.

Plaintiff has alleged that he suffered bruising and swelling of the head, face, mouth, wrist and hands, and a broken tooth, as a consequence of the force applied against him during the incident. *Complaint*, p. 4; *Notification of Grievance*, attached to *Complaint*; *Plaintiff Depo.*, pp. 29, 34, 50-51, 54, 68-69. Defendant contends that he is entitled to summary judgment because there is no credible evidence that plaintiff suffered any injury arising out of the incident; any force applied to plaintiff was therefor merely *de minimis* and of no constitutional import. *See Hudson*, 503 U.S. at 8 (finding that not "every malevolent touch by a prison guard gives rise to a federal cause of action"). More specifically, defendant contends that plaintiff's failure to seek immediate medical attention following the incident is fatal to his claims. Defendant further argues that plaintiff has failed to offer expert testimony necessary to prove proximate causation of plaintiff's alleged injuries. The Court shall address each argument in turn.

### 1.   Failure to seek immediate medical attention

Defendant contends that plaintiff never reported or complained about any injury suffered as a result of the incident. *Reply*, p. 4 (citing *Declaration of Karen Stanforth* ("*Stanforth Declaration*") and *Declaration of Kooljo Ntim* ("*Ntim Declaration*"), attached as *Exhibit C* and *D*, respectively, to the *Motion for Summary Judgment*). Nurse Ntim performed a medical examination of plaintiff on January 24, 2008. *Ntim Declaration*, ¶ 3; *Exhibit A* attached thereto ("*Medical Exam Report*"). Nurse Ntim has no independent recollection of this examination but instead relied on the his report regarding the examination. *Deposition of Kooljoe Ntim*, Doc. No. 138 ("*Ntim Depo.*"), p. 38. Nurse Ntim testified that, as a general practice, he performs a head-to-toe evaluation and records any injuries that he finds. *Id.* at 22-23. When evaluating plaintiff, Nurse Ntim noted that plaintiff "denies any pain / discomfort at present." *Medical Exam Report*. Defendant argues that this evidence establishes that plaintiff made no complaint to Nurse Ntim of any injury and, furthermore, that no bruising was present. Defendant further points to the testimony of Karen Stanforth, the Healthcare Administrator who reviewed plaintiff's medical records. *Stanforth Declaration*, ¶¶ 1, 3. According to Ms. Stanforth, those medical records do not reflect any complaints by plaintiff of injuries. *Deposition of Karen Stanforth*, Doc. No. 137, pp. 36-37 ("*Stanforth Depo.*").

Plaintiff, who insists that he immediately complained to defendant that defendant was hurting him, *Plaintiff Depo.*, pp. 23, 27, reads this evidence differently. Plaintiff notes, first, that Ms.

Stanforth reviewed only medical records, not dental records.
Moreover, plaintiff complains that Ms. Stanforth's review was made for
the purpose of this litigation and not as part of her normal course of
duties. *Id*. at pp. 19, 21, 43. Ms. Stanforth, who admitted that she
is not a physician qualified to offer diagnoses or causation opinions,
never spoke to plaintiff or to Nurse Ntim about the incident. *Id*. at
33, 44. As to the *Medical Exam Report*, plaintiff argues that the
document simply indicates that as of January 24, 2008 – *i.e.*, three
weeks after the incident – plaintiff was not in pain or discomfort.
Plaintiff also argues that bruising or swelling may not have been
apparent three weeks after the incident and that any nerve injury
would not have been visible. Therefore, plaintiff contends, the
*Medical Exam Report* does not establish that plaintiff did not complain
of injuries arising from the incident nor does it establish that he
did not in fact suffer injuries as a consequence of the incident.

In any event, plaintiff argues, the fact that he may not have
immediately requested medical attention is not dispositive. *Memo. in
Opp.*, pp. 15-16 (citing *Zamboroski v. Karr*, No. 04-73194, 2007 U.S.
Dist. LEXIS 11140, at *16 (E.D. Mich. Feb. 16, 2007) (finding that
"[t]he fact that [the inmate] never requested to see a doctor does not
render his injuries *de minimis* as a matter of law"); *Armer v.
Marshall*, No. 5:09-CV-00086-R, 2011 U.S. Dist. LEXIS 70242 (W.D. Ky.
June 28, 2011) (denying summary judgment where, *inter alia*, plaintiff
did not seek medical attention and failed to complain of injury in
later visits to the hospital)). Moreover, ODRC policy provides that
"[i]mmediately following a use of force, medical attention shall be
provided even when the inmate does not appear to be injured." Policy

39

Number 63-UOF-01, at VI(G)(1), attached as *Exhibit D* to *Memo. in Opp.*
Here, plaintiff was not examined until January 24, 2008, after he
filed his *Notification of Grievance* on January 10, 2008.

Plaintiff's arguments are well-taken.  Construing all of the
evidence in the light most favorable to plaintiff, the Court concludes
that there exists a genuine issue of fact as to whether plaintiff
denied injury or complained of injury suffered as a consequence of the
incident.

### 2.    Bruising and swelling

Plaintiff also alleges that he suffered bruising and swelling as
a result of the incident of January 3, 2008.  Defendant takes the
position that plaintiff must provide expert medical testimony to
support an Eighth Amendment claim in order to survive summary
judgment.  *See Defendant's Supplemental Reply*, pp. 3-4 (citing, *inter
alia*, *Yanovich v. Sulzer Orthopedics, Inc.*, No. 1:05 CV 2691, U.S.
Dist. LEXIS 90332, at *8 (N.D. Ohio Dec. 14, 2006) (stating, in the
context of a products liability claim, that "[u]nder Ohio law, a
plaintiff must present expert medical testimony to establish causation
when he asserts a specific physical injury, the cause for which is not
within common knowledge").  Although plaintiff "agrees that expert
medical testimony may be required with respect to some aspects of his
Eighth Amendment claim" at trial, he argues that expert medical
testimony is not necessary to overcome the *Motion for Summary
Judgment.  Plaintiff's Sur-Reply*.  More specifically, as to
allegations of bruising and swelling, plaintiff contends that expert
testimony is not necessary because it is within common knowledge that
these injuries could result an application of excessive force.  *Id*. at

40

3. According to plaintiff, expert testimony is not required before a jury could find that bruising and swelling could be the result of being slammed face-first into a wall. *Id*. Defendant, however, disputes that plaintiff actually suffered any bruising or swelling because there are no medical records to support this injury.

For the reasons state *supra*, the Court concludes that there exist genuine issues of material fact regarding plaintiff's allegation that he suffered bruising and swelling as a result of defendant's application of excessive force.

### 2. Nerve injury

Plaintiff also alleges that he suffered nerve injury following defendant's use of excessive force. Plaintiff agrees that Dr. Clinchot diagnosed carpal tunnel syndrome and found injury to only the Median nerve. However, plaintiff challenges Dr. Clinchot's conclusion that such an injury and diagnosis is inconsistent with a use of handcuffs. For example, plaintiff notes that Dr. Clinchot conceded that tight handcuffs could block venous egress from the hand, and that venous engorgement could be a cause of carpal tunnel syndrome. *See Clinchot Depo.*, pp. 49-50. In addition, plaintiff's own medical expert, Kenneth Mankowski, D.O., supports plaintiff's allegation that he suffered nerve damage as a consequence of the use of handcuffs. *See Report* dated May 18, 2011 ("*Final Mankowski Report*"), attached to *Affidavit of Kenneth Mankowski, D.O.*, attached as *Exhibit A* to *Plaintiff's Sur-Reply*. According to Dr. Mankowski, plaintiff likely (1) suffered an aggravation of a previously existing median nerve injury following defendant's use of handcuffs, or (2) cervical

41

radiculopathy.  *Id*. at 2.[9]

Defendant attacks the *Final Mankowski Report* by noting that Dr. Mankowski's initial report concluded that the use of handcuffs was not the cause of plaintiff's carpal tunnel syndrome.  *See Report* dated November 17, 2010 ("*Initial Mankowski Report*"), attached as *Exhibit A* to *Defendant's Response to Sur-Reply*.  Differences that may exist between the *Initial Mankowski Report* and the *Final Mankowski Report* – and the significance of any such differences – may go to the weight of Dr. Mankowski's expert opinions and to the credibility of plaintiff's allegation that he suffered nerve damage as a consequence of the incident. As the record now stands, however, the Court is presented with two contrary conclusions as to the etiology of plaintiff's median nerve injury. Under these circumstances, the Court concludes that there exists a genuine issue of material fact as to whether plaintiff suffered an injury to the median nerve as a result of the incident of January 3, 2008.

### 3.    Dental injury

Finally, plaintiff alleges that he sustained dental injuries, *i.e.*, broken teeth, because of defendant's use of excessive force. Relying on the testimony of Dr. Taylor, *see supra*, defendant contends that plaintiff lost two teeth – not as a result of any application of force by defendant – but as a consequence of periodontitis and chronic tooth decay.  In response,  plaintiff relies on his own expert's opinion who states that "[t]here is no documentation that Mr. Wilson's periodontal condition was severe enough to weaken teeth to the point

---

[9]Dr. Mankowski also opined that a third, less likely but possible, etiology is brachial plexopathy.  *Id*. at 2.

of atraumatic avulsion." *Report of Dr. Rorapaugh* ("*Rorapaugh Report*", ¶ 2, attached to *Affidavit of R. Donald Rorapaugh Jr., D.D.S.*, attached as *Exhibit B* to *Plaintiff's Sur-Reply* ("*Rorapaugh Affidavit*"). Dr. Rorapaugh also opines that "[t]ooth fracture or damage reported here is consistent with blows to the face." *Id.* at ¶ 3. Although he did not have the benefit of plaintiff's x-rays, which were not timely produced by defendant, Dr. Rorapaugh criticized ODRC's record-keeping, "[p]articularly when attempting to document periodontal condition, caries, or anatomic condition of teeth and bone." *Id.* at ¶ 4. Defendant challenges Dr. Rorapaugh's opinion as mere speculation based on the credibility of plaintiff's version of the facts. According to defendant, there is no medical corroboration of injury to plaintiff's teeth.

This Court concludes that Dr. Rorapaugh has sufficiently raised a material question as to the condition of plaintiff's teeth at the time of the extractions and as to the conditions that may have necessitated those extractions. State differently, the Court cannot conclude that the *Rorapaugh Report* is so deficient as to fail to create a genuine issue as to these material facts.

In short, and after viewing the evidence in the light most favorable to plaintiff, the Court concludes that there exist genuine issues of fact relating to the material issue of whether plaintiff suffered more than *de minimis* injury as a result of the incident of January 3, 2008. The Court therefore concludes that the grant of summary judgment is unwarranted.

**WHEREUPON**, *Defendant Leon Hill's Second Motion for Summary*

43

*Judgment*, Doc. No. 110, is **DENIED**; *Motion of Plaintiff Lawrence E. Wilson to Strike the Affidavit of Dr. Clayborn Taylor and to Exclude His Medical Opinions*, Doc. No. 126, is **DENIED**; and *Motion of Plaintiff Lawrence E. Wilson to Strike the Affidavit of Dr. Daniel Clinchot and to Exclude His Medical Opinions*, Doc. No. 127, is **DENIED**.


March 29, 2012                    *s/Norah McCann King*
                                  Norah M<sup>c</sup>Cann King
                                  United States Magistrate Judge